Filed 8/9/22  P. v. Young CA2/4
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE, | B294537 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA064957) |
| v. | |
| REGINALD RAYDELL YOUNG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles Chung, Judge.  Affirmed as modified with directions.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen, Michael C. Keller and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

In 2018, a jury found appellant Reginald Young guilty of felony murder, attempted robbery, and burglary of an inhabited building. The jury also found true allegations that appellant personally used a firearm within the meaning of Penal Code sections 12022.53 and 12022.5.[1]

We affirmed appellant's convictions on appeal, but ordered several corrections to the abstract of judgment, sentencing minute order, and appellant's award of conduct credits. (*People v. Young* (April 5, 2021, B294537) [nonpub. opn.].) Appellant also argued that we should remand the matter to allow the trial court to exercise its discretion to strike the firearm enhancements imposed under sections 12022.53 and 12022.5, or, alternatively, impose lesser, uncharged enhancements. We declined to do so, concluding that the court did not have such discretion.

Appellant petitioned for review in the California Supreme Court. While that appeal was pending, the Supreme Court decided *People v. Tirado* (2022) 12 Cal.5th 688, 700 (*Tirado*), holding that a trial court had discretion to impose a lesser, uncharged firearm enhancement under section 12022.53 instead of the "binary" choice of striking or imposing the enhancement found true by the jury. Subsequently, the Supreme Court granted appellant's petition for review and transferred the case to this court with directions to vacate our prior opinion and reconsider the enhancement issue in light of *Tirado*. (See Cal. Rules of Court, rule 8.528(d).) We vacated our prior opinion and the parties submitted supplemental briefs.

We reissue the portions of our prior opinion rejecting appellant's claim of error regarding his petition to disclose juror information, denying his request for a hearing on his ability to pay the fines and fees imposed at sentencing, and correcting errors in the record.

We reconsider appellant's request for remand to allow the trial court to consider imposing lesser firearm enhancements. Appellant also seeks resentencing based on recent changes to sections 1170 and 654. Respondent Attorney General contends that remand based on any of these changes would be futile and any error was harmless. We agree with appellant that the recent amendment to section 1170 requires remand to the trial court for

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

reconsideration of his sentence. On remand, the trial court may also consider the full extent of its discretion under sections 12022.53 and 654. We therefore affirm appellant's convictions and remand the matter for resentencing.

## PROCEDURAL HISTORY

An information filed in 2015 and amended in 2017 charged appellant, Erin Chase[2], and Jason West with the murder of Marc Spinner (§ 187, subd. (a), count one), attempted robbery (§§ 664, 211, count two), and burglary of an inhabited building (§§ 459, 667, subd. (c), count three). The information further alleged appellant personally used a firearm (§ 12022.53, subds. (b)-(d) [counts 1-2]; § 12022.5, subd. (a) [count 3]) and that a principal was armed with a firearm (§ 12022, subd. (a)(1) [counts 1-3]). The information also alleged that the murder was committed while appellant was engaged in the attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)).

In June 2017, the court declared a mistrial after the jury in appellant's first trial declared it was deadlocked. Appellant was re-tried in October 2018. On October 30, 2018, the jury found appellant guilty on all three counts. The jury also found true the firearm allegations under section 12022.53, subdivision (d) (counts one and two) and section 12022.5, subdivision (a) (count three), as well as the allegation that appellant committed the murder during the commission of an attempted robbery.

On December 11, 2018, appellant filed a petition for disclosure of juror information. The People filed an opposition, arguing that appellant had not shown good cause for release of juror information. The court denied the motion.[3]

The court sentenced appellant to life in prison without the possibility of parole on count one, plus 25 years to life for the firearm enhancement in section 12022.53, subdivision (d). On count two, the court imposed the upper term of three years, plus 25 years to life pursuant to section 12022.53, subdivision (d); on count three, the court imposed the upper term of six years, plus the high term of 10 years pursuant to section 12022.5, subdivision (a).

---

[2]     Erin Chase is also referred to in the record as Joshua Chase.
[3]     We discuss further details regarding this motion in Discussion Section I, *post*.

3

The court stayed the sentences on counts two and three pursuant to section 654.  Appellant timely appealed.

On appeal, appellant argued that the trial court erred by denying his request for a hearing in support of his petition to disclose juror information. He also sought remand to allow the trial court to exercise its discretion to impose lesser firearm enhancements and for a hearing on his ability to pay the fines and fees imposed at sentencing. We rejected these arguments and affirmed the judgment.  However, we agreed with the parties that there were several errors in the abstract of judgment, sentencing minute order, and appellant's award of conduct credits, and ordered their correction.

Appellant filed a petition for review with the California Supreme Court. On June 23, 2021, the Supreme Court granted appellant's petition, deferring further action pending consideration and disposition of related enhancement issues in *People v. Tirado*, S257658.  The court subsequently held in *Tirado, supra*, 12 Cal.5th at p. 700, that a trial court could strike a section 12022.53, subdivision (d) firearm enhancement and instead impose a lesser, uncharged enhancement.

On April 27, 2022, the Supreme Court transferred the matter to this court, "with directions to vacate its decision and reconsider the cause in light of *People v. Tirado* (2022) 12 Cal.5th 688."  Both parties subsequently filed supplemental briefs.

## FACTUAL BACKGROUND

### I.  Prosecution Evidence

#### A.  *The incident*

The victim, Marc Spinner, lived in Lancaster, California with his mother and two brothers, Joshua and Cameron.  Early in the morning on June 28, 2014, deputy Wesley Guthrie of the Los Angeles County Sheriff's Department (LASD) responded to a report of shots fired at the Spinner residence. Guthrie testified that he entered the home through the open garage and saw bullet holes in the door leading from the garage into the house.  There was something heavy blocking the door and he could see blood on the floor, so he and another deputy entered the home through the front door.  In the hallway leading to the garage, the deputies found Spinner slumped against the door.  His hands and feet looked like they had been

4

bound and there was a safe on the ground next to him. Spinner was pronounced dead at the scene. Deputies discovered Cameron asleep in his bedroom. Cameron testified that he did not hear anything during the incident and was sleeping with noise cancelling headphones.

## B. *Investigation*

LASD investigators found four gun cartridge cases in the garage and one in the hallway, and five bullet holes in the door from the garage into the house. Inside the safe found next to Spinner, detectives discovered prescription pill bottles; marijuana; a concentrated form of cannabis called "wax"; and cash.

For several months, LASD detectives had no potential suspects. Then, in November 2014, the results from DNA taken from Spinner's fingernails showed appellant's DNA. Appellant had been arrested in July 2014, about two weeks after the incident, for possession of marijuana for sale and possession of a handgun. After receiving the DNA results, detectives matched the gun taken from appellant to the cartridge cases from the murder scene. Appellant was arrested on December 16, 2014. Detectives later arrested West and Chase.

Spinner's autopsy revealed three gunshot wounds: a fatal wound on the top of the head, one through his left thigh, and a superficial wound on his abdomen. The parties stipulated at trial that duct tape on Spinner's ankle contained DNA of Spinner and Chase, and nail clippings from Spinner's hands contained DNA from Chase and appellant. The parties also stipulated that the gun recovered from appellant fired the bullet found in Spinner's head, as well as the five cartridge cases recovered from the residence and two expended bullets found inside the home.

## C. *Appellant's interviews*

LASD detective Louis Aguilera and his partner conducted two interviews with appellant after he was arrested on December 16, 2014.[4] The prosecution played excerpts of the interviews for the jury.

---

[4] The court found that appellant had validly waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 at the start of the interviews.

During the first interview, appellant denied knowing or recognizing Spinner. He admitted that the gun he had at the time of his arrest in July was his and said he bought it in mid-July from a guy known as "G-man."

A few hours later, during his second interview, appellant admitted that he heard about Spinner from West, who was his "wife's sister's baby father." West told appellant that "he knew a guy that knew how to bake my weed into 'Wax.'" Appellant told the detectives that on June 27, 2014, he was hanging out with West and appellant's cousin, Chase. Around 7:00 p.m., West suggested that they should meet Spinner because West wanted to buy some "Xanax bars." West drove them to Spinner's house. Appellant claimed they had not planned to rob Spinner, but that during the car ride, West told them that Spinner had two safes in his room. Appellant also said that "before we even got out of the car it was a discussion with me and [West] about the guy having stuff in the house. So, I guess you could say yes, we did plan to rob it."

After they parked near Spinner's house, West went in first to buy the Xanax bars, while Chase and appellant waited in the car. Once West returned, he told appellant that he could "go in there and meet the guy," to see if he would sell appellant some marijuana, and that Spinner was not a "small time guy." Appellant and Chase walked up to the house and saw that the garage door was partially open. They walked into the garage and knocked on the door leading from the inside of the garage into the house. Spinner opened the door and appellant told him they wanted to talk about buying some weed. Appellant said Spinner seemed high, and he asked if they wanted to smoke some marijuana. The three men went to Spinner's bedroom, smoked marijuana, and talked. Appellant said that he was looking around Spinner's bedroom, but did not see any of the big safes that West had described, just one little safe. According to appellant, Spinner "start[ed] getting hysterical" and saying they were going to rob him. Appellant insisted that was not true. Appellant had noticed a rifle in the room, and when Spinner appeared to move toward the rifle, appellant grabbed Spinner. Appellant grabbed the rifle and threw it on the bed, then Chase started punching Spinner.

Appellant admitted that he had his gun with him. He stated that at this point he was just trying to leave, and he drew his gun while Chase duct taped Spinner's wrists so he would not come after them. Appellant explained that when things escalated, he thought "this is obviously getting violent, so I'm like well, there might be something in the safe so let's go ahead and just tie him up." Then Chase grabbed the safe and left the room. However, Chase dropped the safe near the garage door. He later told appellant that he could not open the door and the safe was too heavy. As appellant was leaving, he was trying to close the door between the garage and the house, when he saw Spinner coming around the corner holding the rifle. Appellant fired his gun through the door back into the house multiple times, then took off running. He claimed that he did not intend to use his gun or shoot at anyone, and he did not intend to hit Spinner, but was "hoping that it would scare him off enough so we could just leave." Appellant learned later from West that Spinner had died, but he thought maybe Spinner was killed in some other incident "because when I shot, I was on the other side of the door."

## II.   Defense Evidence

Appellant testified that he was 25 years old at the time of the incident. He first learned about Spinner a few days before the incident, when West mentioned he knew a dealer who might be a more consistent marijuana supplier. Appellant claimed that when he met with West and Chase on June 27, 2014, he was thinking about finding a supplier, not about robbing Spinner.

As they headed to Spinner's house, West started talking about how Spinner was "big time," and had large safes and lots of money, but appellant just thought West was trying to convince him to meet with Spinner, not to rob him. Appellant testified that he and Chase entered Spinner's house through the garage and knocked on the door. Spinner answered and they explained who they were, went to his room, talked, and smoked marijuana. Appellant had his gun with him because he generally carried it with him. When Spinner became agitated and accused them of being there to rob him, appellant denied it and tried unsuccessfully to calm him down. Appellant had noticed a rifle near the door when they entered the room. As Spinner became more agitated, appellant thought Spinner was "going for the rifle," so

7

appellant grabbed his arm.  He could not tell at the time that the rifle was a BB gun.  They started shoving and then punching each other.  Appellant tried to leave but the fight continued, so he told Chase to grab the duct tape on Spinner's dresser and tape Spinner so they could leave.  He took out his gun while Chase was taping Spinner's wrists, to "get him to be still."

Appellant explained that when he told police that "I guess you could say we did plan to rob him," he meant it could be perceived that way after the fact, not that he had that intention at the time.  Appellant had agreed with the detectives when they asked if he decided to rob Spinner during the fight because he "felt like it was what they wanted to hear."  Appellant noted that he did not take anything from Spinner's house and did not tell Chase to take anything.  He claimed he did not see Chase grab the safe.

Appellant left the room and was trying to close the garage door behind him when he saw Spinner coming around the corner.  He thought Spinner was holding the rifle and was going to shoot him, so he "pulled the trigger." His intention was to scare Spinner off.  He did not know at the time that he had hit him.

Appellant also presented two witnesses who testified that appellant did not have the character for violence or robbery.

## DISCUSSION

### I.    Disclosure of Juror Information

Appellant contends the trial court erred in finding he did not make a prima facie showing of good cause in support of his petition for disclosure of juror identifying information.  We find no abuse of discretion and therefore affirm.

#### A.    *Background*

During a break from the presentation of the defense case at trial, the court stated that it had received information requiring inquiry of jurors number 6 and 12.  First, the court asked juror number 6 whether there was anyone associated with the case who spoke to her.  The juror disclosed that "before I knew who that person was," she had an interaction with a woman she believed to be "the grandmother of the first gentleman that testified [Spinner's brother Cameron]. . . .  I don't know that for sure." Juror number 6 further explained that while waiting in the court cafeteria to order food, she

was standing behind the woman, "[a]nd she said, 'the menu is up here.' And I thought she was a juror and she said, 'I'm not a juror.' And I said, 'Oh.' But she said, 'it would be improper for me to tell you who I am' at that point." Later on a break, after Cameron testified, another juror told juror number 6 that she thought the woman from the cafeteria was Cameron's grandmother. The juror stated she had not had any other conversations with this woman. She responded "no" when asked if there was anything about that interaction that would cause her to favor one side over the other.

Next, juror number 12 told the court that after hearing appellant's police interviews, he realized that he graduated from the same high school at the same time as appellant. The juror also recognized appellant's wife when she came into court, although he said they were not friends or even acquaintances.

The court indicated it did not see an issue with either juror. Neither side raised an objection and both jurors remained on the jury.

After trial had concluded, appellant filed a petition for disclosure of juror information. His counsel asserted that he needed to communicate with the jurors "for the purpose of verifying that no discussions about anything not received through evidence happened," and that the information might lead to evidence supporting a motion for a new trial. He noted that the jury foreperson (juror number 12) attended high school with appellant and that appellant's family "asserts that some jurors were speaking outside with the victim's family during the trial." The People filed an opposition, arguing that appellant had not shown good cause for release of juror information.

In support of his claim, appellant filed a second motion requesting access to the court hallway security video footage. The supervising judge denied the motion, finding that appellant had not established good cause and that his evidentiary proffer was "too speculative" to justify the cost and the risk to court security.

Following denial of appellant's motion to obtain security footage, the trial court heard argument regarding appellant's motion to discover juror information. Appellant's counsel stated that he had spoken with appellant's family, who indicated there was an additional contact between juror number

6 and someone in the victim's family outside the courtroom. Appellant's counsel also noted the relationship previously disclosed by juror number 12.

The court recalled the questioning of jurors number 6 and 12 during trial, that juror number 6 stated that the conversation was brief and "wholly unrelated" to the case, both jurors confirmed that they could be fair, and both remained on the jury. The court found that "[t]o go beyond that and say that somehow because of that improper jury deliberations were had or improper information was relayed to the jury I think is speculative at best."

The court then turned to appellant's new allegations and inquired whether appellant had supporting evidence regarding the latest contact. Samantha Maybon, appellant's mother, testified that she saw an older lady from Spinner's family approach the water fountain on a break and "exchange[ ] words" with juror number 6, but she did not know what was said. Maybon also stated, without further detail, that Spinner's family member "even approached me before." Maybon testified that this interaction occurred prior to the jury verdict, and at the time she texted appellant's counsel to inform him. When asked by the court about the length of the exchange, she initially stated she did not know, estimating "[m]aybe three minutes." When the court noted that "three minutes is a long conversation," Maybon replied: "It may have been just a moment. She walked up, they exchanged some words, and then they walked off." She also told the court that "[i]t wasn't a conversation." Defense counsel noted that at the time, he thought Maybon was referring to the contact in the cafeteria about which the juror had already testified.

Appellant's wife, Patricia Young, testified that she went to the bathroom during a break in trial, and saw two of the victim's family or friends "discussing the case and how they were happy that they finally found out what happened" and that they felt sorry for the victim's mother. Young stated she believed there were also two jurors in the bathroom at the time.

The court denied the motion. The court found the conversation relayed by Young to be "pretty innocuous at best. I don't see anything remotely wrong with that. I think there is always some relief when we find out what happened in terms of a loved one, and to make that statement I don't think would have prejudiced anyone one way or the other. As far as feeling sorry

10

for the mom, I think if it were something more like, you know, we feel sorry for the mom, she's older, the victim was the only one that cared for her. . . . If they went into details like that and then I can see how the jury would be impacted. But there is always sympathy in a murder case. . . . And the mere statement of we feel sorry for the mom with nothing more, I don't think it is anything that would impact the jury."

The court also found the testimony regarding the contact at the water fountain was "speculative at best." The court reasoned, "So on the one hand I was told that it was a three-minute conversation. On the other hand I was told it was not a conversation. That words were just exchanged and then – from everything I gathered it was more of a passing thing. For all I know the person said are you done at the fountain or, you know – and we make comments like that all the time. Or it may have been excuse me, sorry to bother you. There was nothing to indicate that it was anything more than perhaps a polite exchange that is common in everyday life. There was nothing testified to that there was any physical reaction, any facial reaction, any emotional reaction or even extended exchanging of words. And generally that happens all the time. . . . So without anything more I don't find that there was good cause . . . to discover the juror information."

**B.** *Legal framework*

Under Code of Civil Procedure section 237, any person may petition the trial court for access to personal juror identifying information. (Code Civ. Proc., § 237, subd. (b).) Subject to exceptions not applicable here, "[t]he court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information. . . ." (*Ibid*.) "Good cause, in the context of a petition for disclosure to support a motion for a new trial based on juror misconduct, requires 'a sufficient showing to support a reasonable belief that jury misconduct occurred. . . .'" (*People v. Johnson* (2015) 242 Cal.App.4th 1155, 1161–1162 (*Johnson*), quoting *People v. Cook* (2015) 236 Cal.App.4th 341, 345–346.) The alleged misconduct must be "of such a character as is likely to have influenced the verdict improperly." (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*People*

11

*v. Cook, supra*, 236 Cal.App.4th at p. 346, citing *People v. Wilson* (1996) 43 Cal.App.4th 839, 852.)  Requests for the release of confidential juror records "'should not be used as a "fishing expedition" to search for possible misconduct. . . .'" (*People v. Avila* (2006) 38 Cal.4th 491, 604.)

If the trial court does set a hearing, it must provide notice to each of the jurors, either by personal service or by mail to his or her last known address. (Code Civ. Proc., § 237, subd. (c).)  "Any affected former juror may appear in person, in writing, by telephone, or by counsel to protest the granting of the petition." (*Ibid*.)  "After the hearing, the records shall be made available as requested in the petition, unless a former juror's protest to the granting of the petition is sustained.  The court shall sustain the protest of the former juror if, in the discretion of the court, the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure. . ., or the juror is unwilling to be contacted by the petitioner." (*Id*. subd. (d).)

In *People v. Rhodes* (1989) 212 Cal.App.3d 541 (*Rhodes*) the court set forth a balancing test for considering a defendant's request for disclosure of juror information.[5]  "[T]he *Rhodes* court discerned several policy-based reasons to deny the defendant's request for disclosure of juror identifying information.  These reasons included protecting a juror's state constitutional right to privacy; the possible deterrence of prospective jurors from fulfilling their obligation to serve if they knew they would be subject to postverdict intrusions into their lives; reducing incentives for jury tampering; promoting free and open discussion among jurors in deliberations; and protecting the finality of verdicts." (*Townsel, supra*, at p. 1093, citing *Rhodes*, at pp. 548–549.)

The *Rhodes* court concluded that there was "an appropriate middle ground which can harmonize and satisfy [these] competing societal interests" by recognizing a rule that, upon timely motion, counsel for a convicted

---

[5]     Although *Rhodes* was decided before the statute's present enactment requiring a showing of good cause, the *Rhodes* test survived the amendments. (See *People v. Carrasco* (2008) 163 Cal.App.4th 978, 990 (*Carrasco*); *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1095 (*Townsel*); *People v. Wilson* (1996) 43 Cal.App.4th 839, 852.)

defendant is entitled to disclosure of juror identifying information "if the defendant sets forth a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial. . . . [¶] Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information." (*Rhodes*, supra, at pp. 551–552; see also *Carrasco, supra,* 163 Cal.App.4th at p. 990.)

We review an order on a motion for disclosure of jurors' identifying information under the deferential abuse of discretion standard. (*Carrasco, supra,* 163 Cal.App.4th at p. 991.)

### C. *Analysis*

Appellant contends he established a preliminary showing of juror misconduct sufficient to require the court to order a hearing and provide notice to the jurors pursuant to Code of Civil Procedure section 237, subdivision (c). We find that the trial court did not abuse its discretion in concluding that appellant failed to make a prima facie showing that juror misconduct occurred.

A defendant accused of a crime has a constitutional right "to be tried by 12, not 11, impartial and unprejudiced jurors." (*People v. Nesler* (1997) 16 Cal.4th 561, 578, citing U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16; *Irvin v. Dowd* (1961) 366 U.S. 717, 722; *In re Hitchings* (1993) 6 Cal.4th 97, 110.) "'Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors, it is settled that a conviction cannot stand if even a single juror has been improperly influenced.'" (*People v. Nesler, supra*, 16 Cal.4th at p. 578, citations omitted.) "Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias. (*Ibid.*, citing *People v. Marshall* (1990) 50 Cal.3d 907, 949–951; *In re Carpenter* (1995) 9 Cal.4th 634, 650–655.)

13

During trial, the court questioned juror number 6 regarding her contact with Spinner's grandmother in the cafeteria, and questioned juror number 12 regarding his disclosure that he attended high school with appellant. Following those discussions, neither party objected to both jurors remaining on the jury. The trial court found that juror number 6's contact with Spinner's grandmother was brief and unrelated to the case. Appellant provided no evidence to suggest otherwise. Thus, the court was well within its discretion to conclude that this information did not establish good cause for a hearing on juror misconduct.

The only other evidence in support of appellant's petition was the post-trial testimony of appellant's witnesses regarding a second encounter between juror number 6 and an older member of Spinner's family, presumably his grandmother, and a discussion by Spinner's family members in the restroom. The trial court found that Maybon's testimony regarding the encounter at the water fountain suggested it was nothing more than a "passing thing" or a polite exchange. The court relied on Maybon's testimony about the brief nature of the encounter and the lack of reaction by the participants. Based on this evidence, the fact that this was a second contact between Spinner's grandmother and juror number 6 did not, without more, establish a reasonable probability that juror misconduct occurred. We find no abuse of discretion in this conclusion.

We reject appellant's suggestion that Maybon's testimony establishes the possibility that Spinner's grandmother engaged in additional improper contact with jurors. Although Maybon testified that the grandmother approached *her*, she did not identify any other encounters between any members of Spinner's family and any jurors, apart from the incident at the water fountain.

Appellant also argues that the court reached its conclusion by disbelieving Maybon's testimony, thus conducting an improper credibility assessment at the prima facie stage. (See *Johnson, supra*, 242 Cal.App.4th at p. 1164, quoting *Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93, 111–112 ["'A "prima facie" showing refers to those facts demonstrated by admissible evidence, which would sustain a favorable decision *if the evidence submitted by the movant is credited.*'"].) Appellant cites the court's finding

that the evidence of misconduct was "speculative" as demonstrating such a credibility assessment of the witnesses.  We disagree.  The court's statement that appellant's evidence was speculative demonstrated a finding that the evidence did not support a showing of good cause.  Indeed, the court *credited* Maybon's description of the encounter in determining that there was insufficient evidence to establish anything other than a brief, innocuous incident.

Young's testimony regarding the discussion by Spinner's relatives in the bathroom does not alter this conclusion.  The trial court found the evidence innocuous, given that the speakers did not offer details regarding the hardships faced by Spinner's family or other information that might improperly impact a juror, even assuming there was indeed jurors in the bathroom at the time.  On this record, it was not an abuse of discretion for the trial court to conclude that appellant's evidence of juror misconduct was speculative at best, and did not establish good cause for further inquiry.

## II.    Firearm Enhancements

Section 12022.53 provides three different sentence enhancements for the personal use of a firearm in the commission of enumerated offenses: a 10-year enhancement for the personal use of a firearm (§ 12022.53, subd. (b)); a 20-year enhancement for the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).  Under section 12022.5, subdivision (a), "any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense."

At appellant's sentencing in December 2018, the trial court imposed a consecutive term on count one of 25 years to life for the firearm enhancement pursuant to section 12022.53, subdivision (d).  The court also imposed and stayed firearm enhancement terms of 25 years to life on count two (§ 12022.53, subd. (d)) and the upper term of 10 years on count three (§ 12022.5, subd. (a)).

Appellant contends his counsel was ineffective for failing to request at sentencing that the court strike the firearm enhancements in the interest of justice under section 12022.53, subdivision (h).  We are not persuaded.  Appellant also argues that the case should be remanded to allow the trial court to exercise its discretion to impose lesser, uncharged firearm enhancements pursuant to *Tirado*, *supra*, 12 Cal.5th 688.  Because we remand the case for resentencing under the amended section 1170, the trial court may also exercise its discretion to strike any of the firearm enhancements or to impose lesser enhancements.  We express no opinion on whether or how the trial court should exercise such discretion.

**A.     *Ineffective assistance claim***

**1.     *Legal principles***

To prevail on a claim of ineffective assistance of counsel, a defendant must establish both that counsel's performance was deficient and that he was prejudiced by the deficient performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  First, to establish deficient performance, a defendant must show that counsel's representation was objectively unreasonable "under prevailing professional norms."  (*Id*. at p. 688.)  Second, a defendant can show prejudice where there is "a reasonable probability"— meaning "a probability sufficient to undermine confidence in the outcome"— "that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Id*. at p. 694; see also *People v. Goldman* (2014) 225 Cal.App.4th 950, 957.)  Unless defendant establishes otherwise, we presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."  (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

If the record "'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 745-746.)  "Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus."  (*People v. Carter, supra,* 30 Cal.4th at p. 1211.)

### 2. *Analysis*

Effective January 1, 2018, amended sections 12022.5, subdivision (c) and 12022.53, subdivision (h) provide that "[t]he court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement" otherwise required to be imposed by section 12022.5 or section 12022.53. Thus, at the time of appellant's sentencing in December 2018, the trial court had the discretion to strike the firearm enhancements under sections 12022.5 and 12022.53. Appellant contends that he was denied his right to effective assistance of counsel because his counsel did not request that the court strike the firearm enhancements.

At sentencing, the court indicated it had read and considered the probation report and the People's sentencing memorandum. The court stated it was selecting the high term on count two, count three, and the section 12022.5 enhancement based on the following: "The defendant displayed a good amount of planning and sophistication. It seemed that he was acting in concert with someone else. That they had planned out what was about to occur. It doesn't seem to be a spontaneous act. They went into the location. They seemed to know what they were looking for. They utilized a ruse to get to that safe. And then I also find that there was a good amount of cruelty and a cold, calculated decision to commit this crime. As he was leaving, the door was shut. He was out. I understand the victim may have been chasing him but there was no reason for the defendant to shoot through the door, which ultimately ended up killing the victim." The court also noted appellant's "past criminal history is such that it is increasing in nature."

The record is silent as to appellant's counsel's reasons for failing to request that the court strike one or more firearm enhancements at sentencing. We are not persuaded that there could be no satisfactory reason for counsel's silence, particularly given the evidence cited by the court, which supported the conclusion that appellant planned the robbery, pointed his gun at Spinner while Chase restrained him, and then fired multiple shots through the door at Spinner even though his path to escape was unimpeded.

Moreover, even if appellant's counsel had raised an objection, there is no reasonable probability that the court would have exercised its discretion to strike the firearm enhancements. The court selected the upper term on

17

counts two and three, as well as the high term of 10 years for the firearm enhancement on count three pursuant to section 12022.5, subdivision (a). The court also detailed the bases for its selection of the high term, including that appellant "displayed a good amount of planning and sophistication" in planning the crimes and acting in concert with others; that appellant and the others "utilized a ruse to get to that safe"; that appellant displayed "a good amount of cruelty and a cold, calculated decision to commit this crime," particularly by shooting through the door at the victim when there was "no reason" to do so; and that appellant's "past criminal history is such that it is increasing in nature." Thus, the court's rulings and comments are a clear indication it would not strike the enhancement in any event, and therefore that appellant was not prejudiced by his counsel's failure to seek a reduction of his sentence. (See *People v. Chavez* (2018) 22 Cal.App.5th 663, 713; *People v. Gamble* (2008) 164 Cal.App.4th 891, 901.)

**B.** ***Remand under* Tirado**

In his first appeal, appellant argued that the trial court could have exercised its discretion to impose lesser firearm enhancements instead of the three imposed under sections 12022.53, subdivision (d) and 12022.5, subdivision (a). At the time, the question of whether a trial court had discretion to modify a section 12022.53 firearm enhancement by imposing a lesser enhancement was subject to a split among California Courts of Appeal. (Compare *People v. Morrison* (2019) 34 Cal.App.5th 217, 223 [finding discretion] with *People v. Tirado* (2019) 38 Cal.App.5th 637, 643, reversed by *Tirado, supra,* 12 Cal.5th 688 [finding trial court's power under section 12022.53 was "binary: The court can choose to dismiss a charge or enhancement in the interest of justice, or it can choose to take no action."].)

In our prior opinion, we agreed with the appellate court in *Tirado,* concluding that the trial court lacked the discretion to impose a lesser enhancement under section 12022.53. The Supreme Court subsequently resolved the split and reached the opposite conclusion in *Tirado, supra,* 12 Cal.5th at pp. 699-700. As the court explained: "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53(d) enhancement, and the court determines that the section 12022.53(d) enhancement should be struck or dismissed under section

12022.53(h), the court may, under section 12022.53(j), impose a [lesser] enhancement under section 12022.53(b) or (c)." (*Tirado, supra*, 12 Cal.5th at p. 700.)

In his supplemental brief, appellant asserts that the case should be remanded to allow the trial court to consider whether to impose lesser firearm enhancements.[6]  He contends that "it is not clear whether the trial court would have exercised its discretion differently and imposed a lesser firearm enhancement" had it been aware of the "range of firearm enhancements" available.  Respondent counters that remand would be futile given the trial court's "clear" indication that it would not have imposed lesser enhancements even if they were available.

During sentencing, "a defendant is entitled to decisions made by a court exercising informed discretion." (*Tirado, supra*, 12 Cal.5th at p. 694; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*).)  Consequently, "[a] court acting while unaware of the scope of its discretion is understood to have abused it." (*Tirado, supra*, 12 Cal.5th at p. 694; *People v. Carmony* (2004) 33 Cal.4th 367, 378.)  When a trial court sentences a defendant while unaware of the scope of its discretion, remand for resentencing is appropriate unless "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware it had such discretion.'" (*Gutierrez, supra*, 58 Cal.4th at p. 1391, quoting *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8; see also *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)

We need not reach respondent's argument regarding the futility of remanding for reconsideration of the firearm enhancements.  As discussed in section III, *post*, we have concluded that we must vacate appellant's sentence and remand for resentencing based on amendments to section 1170.  On remand, the trial court may revisit all of its prior sentencing decisions in

---

[6]  Appellant asserts that the trial court's discretion under *Tirado* applies to the firearm enhancements under both sections 12022.53 and 12022.5. Respondent counters that the scope of the court's ruling in *Tirado* encompasses only enhancements under section 12022.53.  We need not reach this issue, as the trial court may consider the full extent of its discretion under current sentencing laws upon remand.

light of all new legislation, and therefore may consider whether to exercise its discretion under section 12022.53. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## III.  Additional Sentencing Claims

Appellant also contends that remand is warranted to allow the trial court to exercise its discretion under two other recent statutory amendments. Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3) (S.B. 567), which amends section 1170, subdivision (b), limits a trial court's ability to impose the upper term in a sentencing triad with certain exceptions. Assembly Bill No. 518 (Stats. 2021, ch. 441) (A.B. 518) allows the court to exercise discretion whether to impose or stay the longer of multiple sentences under section 654.

The parties agree that the amendments apply retroactively to this case, as appellant's sentence was not final when they were enacted. (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 306-308, citing *In re Estrada* (1965) 63 Cal.2d 740, 745.) We conclude that appellant is entitled to resentencing under the amended section 1170. On remand, the trial court may also exercise its discretion under all current applicable sentencing laws, including section 654.

### A.  *S.B. 567*

Prior to the enactment of S.B. 567, section 1170 provided that the choice between the lower, middle, and upper term in a sentencing triad "shall rest within the sound discretion of the court," with the court to determine which term "best serves the interests of justice." (Former § 1170, subd. (b).) When choosing a term, the court could rely on "the record in the case, the probation officer's report, other reports . . . and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing." (*Ibid.*) The court could also consider the aggravating and mitigating circumstances set forth in California Rules of Court, rules 4.421 and 4.423.

S.B. 567 became effective January 1, 2022, while this appeal was pending in the Supreme Court. As amended by S.B. 567, section 1170 now

requires that a trial court impose the middle term for any offense with a sentencing triad unless "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) However, the court may "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

Appellant contends the amendment to section 1170 applies to the court's selection of upper terms on counts two and three, as well as the upper term for the firearm enhancement on count three under section 12022.5. Respondent does not dispute that the aggravating circumstances cited by the trial court when sentencing appellant to the upper term on counts two and three were not based on facts that were stipulated to by appellant or found true beyond a reasonable doubt by a jury. Nevertheless, respondent contends that remand is not warranted as any error is harmless beyond a reasonable doubt.

The standard for determining whether remand is required for resentencing under section 1170 is subject to disagreement among our sister courts. Respondent relies on *People v. Flores* (2022) 75 Cal.App.5th 495 (*Flores*), which held, "'[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury,' the error is harmless." (*Id.* at pp. 500-501, quoting *People v. Sandoval* (2007) 41 Cal.4th 825, 839 (*Sandoval*).) In *Sandoval*, the Supreme Court applied this test to determine whether a Sixth Amendment error in failing to submit aggravating circumstances to a jury was harmless, because under the determinate sentencing law at the time, a defendant was *eligible* for the upper term based on a single aggravating circumstance. (*Sandoval, supra*, 41 Cal.4th at pp. 838-839.)

However, the court in *People v. Lopez* (2022) 78 Cal.App.5th 459 adopted a different, two-part test for harmless error. First, the reviewing

court "would have to conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every factor on which the court relied*, because the amended statute requires that every factor on which a court intends to rely in imposing an upper term, with the exception of factors related to a defendant's prior conviction(s), have been admitted by the defendant or proven to a jury (see § 1170, subd. (b))." (*Id*. at pp. 465–466.) If the court did not reach such a conclusion, then the court must consider "the second question, which is whether [it] can be certain, . . . that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied. If the answer to both of these questions is 'no,' then it is clear that remand to the trial court for resentencing is necessary." (*Id*. at pp. 467–468, fn. 11.)

We need not resolve this dispute, as the circumstances here fail to establish harmless error even under the "single aggravating circumstance" test adopted in *Flores*. The trial court in this case cited as factors in aggravation that the crimes involved a high degree of cruelty, showed planning and sophistication, and that appellant's criminal history was escalating.[7] (See Cal. Rules of Court, rule 4.421(a).) Respondent contends that "the evidence unquestionably supports at least the first factor" regarding appellant's cruelty. Specifically, respondent argues that a jury would have found beyond a reasonable doubt that appellant displayed a high degree of cruelty based on the fact that he shot repeatedly at Spinner through a closed door "despite the fact that Spinner was defenseless because appellant and his accomplices had bound his wrists and ankles with duct tape."

---

[7]    We note that appellant argues this last finding was unsupported by the evidence, as his criminal history consisted of two misdemeanor convictions in 2012 for reckless endangerment and making a false statement and a felony conviction in 2014 for possession of marijuana for sale. Appellant's arrest for drug possession occurred in July 2014, approximately one month after the incident at issue here. Respondent does not suggest that this history alone would have been sufficient to impose the high terms under the amended version of section 1170.

We are not persuaded that we can find beyond a reasonable doubt that a jury would have found beyond a reasonable doubt that appellant displayed a high degree of cruelty in shooting Spinner. It was undisputed at trial that appellant fired shots through the closed garage door while fleeing the scene and that those shots resulted in Spinner's death. However, there was some evidence contrary to respondent's claim that Spinner was defenseless at the time he was shot. Appellant claimed at trial that he saw Spinner chasing after them and he believed Spinner was holding a rifle. Spinner's body was found next to the door, and although there was evidence that he had been restrained, he was no longer bound in the chair where appellant and the other assailants had left him. As our Supreme Court has noted, "to the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Sandoval, supra*, 41 Cal.4th at p. 840.)

We find this concern applicable to these circumstances. The facts are sufficiently disputed and the standard of a "high degree of cruelty" is sufficiently vague that we cannot say beyond a reasonable doubt that the jury would have made the same finding as the trial court to support this aggravating circumstance. Moreover, respondent does not contend that this high bar could be met using the other two factors cited by the trial court. Thus, we cannot be satisfied beyond a reasonable doubt that the jury would have found true at least one aggravating circumstance. Accordingly, the error was not harmless, and we must vacate and remand appellant's case for resentencing consistent with amended section 1170, subdivision (b). We express no opinion on how the trial court should exercise its discretion in resentencing appellant under this statute.

### B. *A.B. 518*

Appellant also contends that he is entitled to resentencing pursuant to the revised version of section 654. A.B. 518 amended section 654 to remove the requirement that a court impose the longest sentence when a defendant is convicted of more than one offense arising from the same conduct. As such, a court now has discretion to select the longer or shorter sentence when

imposing one term and staying another pursuant to section 654. (See § 654, subd. (a).) Because we have concluded that we must vacate appellant's sentence and remand for resentencing under section 1170, the trial court may also consider the applicability of A.B. 518 to appellant. (See *People v. Valenzuela, supra,* 7 Cal.5th at pp. 424–425.)

## IV. Fines and Fees

Appellant contends the trial court erred by requiring him to pay various fines and fees without finding that he had the ability to pay them. He contends a hearing on his ability to pay was required under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) despite his failure to request such a hearing or otherwise object to any of the fines and fees imposed.[8] We disagree.

At sentencing, the trial court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)), a $10,000 parole revocation fine, stayed (§ 1202.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), a $30 criminal conviction assessment (Gov. Code, § 70373), and $10 crime prevention fee (§ 1202.5).[9] At the time of sentencing, the statutory minimum fine under section 1202.4 was $200. Thus, the $10,000 restitution fine the trial court imposed exceeded the statutory minimum. Even prior to *Dueñas*, section 1202.4 permitted a defendant to present information regarding his or her ability to pay any fine amount above the minimum. (§ 1202.4, subd. (c).) Thus, by failing to object to the restitution fine and to present evidence he did not have the ability to pay it, appellant forfeited the argument that the trial court erred in imposing the fine without considering his ability to pay. (See *People v. Avila* (2009) 46 Cal.4th 680, 729; *People v. Smith* (2020) 46 Cal.App.5th 375, 395; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.)

With respect to the non-punitive court operations assessment and court construction fees, we note that given appellant's failure to object to the

---

[8] The California Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, on the issue of whether a trial court must "consider a defendant's ability to pay before imposing or executing fines, fess, and assessments" and if so, "which party bears the burden of proof regarding the defendant's inability to pay."

[9] We discuss the corrections to these amounts in section V, *post*. We have used the corrected amounts here.

$10,000 restitution fine based on the ability to pay, it is unlikely he would have done so with respect to $80 in assessments. (*People v. Frandsen, supra*, 33 Cal.App.5th at p. 1154; accord *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1074.) Moreover, the imposition of $80 in fees and assessments was harmless given appellant's ability to earn wages during his lengthy prison sentence and his youth at the time of sentencing. (See *People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140 [any error under *Dueñas* harmless when defendant "will have the ability to earn prison wages over a sustained period"]; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [defendant's ability to pay includes the future ability to obtain prison wages and to earn money after release from custody].)

For this reason we also reject appellant's contention that any forfeiture was a result of the ineffective assistance of counsel. Appellant has not shown his counsel had no tactical reason not to object to the assessments, or that he had a reasonable possibility of prevailing by establishing that he was unable to pay the assessments.

## V. Correction of Sentencing Errors

Appellant contends the sentencing minute order and abstract of judgment contain several errors that must be corrected. Respondent agrees. To the extent applicable following resentencing, we direct the trial court to modify the judgment to correct the following errors.

First, the parties point out discrepancies in the imposition of assessments and fees between the court's oral pronouncement of judgment, the minute order from the hearing, and the abstract of judgment. In orally pronouncing appellant's sentence, the court imposed one $40 court operations assessment (§ 1465.8, subd. (a)(1)) and one $30 criminal conviction assessment (Gov. Code, § 70373). However, the minute order and the abstract of judgment reflect three court operations assessments ($120 total) and three criminal conviction assessments ($90 total). Generally, where there is a discrepancy between the oral pronouncement of judgment and the abstract of judgment or minute order, the oral pronouncement controls, and we may order correction of any such errors. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

Second, the court imposed two $10 crime prevention fines (§ 1202.5), one each on counts two and three.  The parties agree that this fine may not be imposed on count two, as attempted robbery is not one of the enumerated offenses under section 1202.5, subdivision (a).  (*People v. Jefferson* (2016) 248 Cal.App.4th 660, 663 ["attempted robbery is not among the enumerated offenses for which a local crime prevention programs fine may be imposed"].)  We agree, and order the crime prevention fee imposed on count two stricken.

Finally, the parties agree that appellant should have received 1,457 days of actual custody credit, rather than the 1,455 actual days awarded by the trial court.  We may correct an error in calculating the award of presentence credits at any time.  (See *People v. Turrin* (2009) 176 Cal.App.4th 1200, 1205.)  Therefore, to the extent applicable following resentencing, the trial court is directed to modify the judgment to reflect that appellant is to receive presentence credits of 1,457 days of actual custody credit.

## DISPOSITION

Appellant's convictions are affirmed.  We vacate his sentence and remand the matter for resentencing in a manner consistent with amended section 1170, subdivision (b).  To the extent applicable following resentencing, we also direct the trial court to modify the judgment to (1) reflect a $40 court operations assessment (§ 1465.8, subd. (a)(1)) and a $30 criminal conviction assessment (Gov. Code, § 70373) on count one, and a $10 crime prevention fine (§ 1202.5) on count three, and (2) award appellant two additional days of presentence custody credit.  Following resentencing, the court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.                                    CURREY, J.


26